Filed 6/2/23  P. v. Galindo-Garcia CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>  EDUARDO GALINDO-GARCIA,<br><br>      Defendant and Appellant. | A163966<br><br>(Alameda County<br>Super. Ct. No. 18CR015091)<br><br>ORDER MODIFYING OPINION |

THE COURT:

On the court's own motion, the judicial panel for this court's May 23, 2023 opinion is corrected from

     Goldman, J., Brown, P. J., Streeter, J.

to

     Goldman, J., Streeter, Acting P. J., and Fineman, J. \*

There is no change in the judgment.

June 2, 2023                   STREETER, Acting P. J.

---

\* Judge of the Superior Court of California, County of San Mateo, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br> EDUARDO GALINDO-GARCIA,<br><br>        Defendant and Appellant. | A163966<br><br>(Alameda County<br>Super. Ct. No. 18CR015091) |

A jury convicted Eduardo Galindo-Garcia of second degree murder (Pen. Code,[1] § 187, subd. (a) (count 1)) and shooting at an occupied vehicle (§ 246 (count 2)). The trial court sentenced him to 25 years to life in prison. Galindo-Garcia argues that evidentiary error, instructional error, prosecutorial misconduct, and cumulative error require reversal of his conviction.

Although our review of the record reveals certain errors, we conclude they are individually and cumulatively harmless. Nevertheless, as the Attorney General concedes, remand for resentencing is required in light of retroactive changes to the determinate sentencing law. In all other respects, the judgment is affirmed.

---

[1]All further undesignated statutory references are to the Penal Code.

## FACTS

It is undisputed that Galindo-Garcia, while driving in Oakland, shot and killed another driver. The only issue at trial was whether Galindo-Garcia shot in self-defense.

### I. *Prosecution's Case*

A. <u>Events of June 9, 2018</u>

Galindo-Garcia attended a party at a friend's house in Oakland along with his then-girlfriend Delmy Romero and Romero's five-year-old daughter. They arrived at the party around 7:30 p.m. and stayed for an hour or two. While at the party, Romero saw Galindo-Garcia leave with some friends and return about 30 to 45 minutes later. When Galindo-Garcia came back, Romero thought that he seemed "different" and "nervous." Galindo-Garcia told Romero that he wanted to leave the party.

Upon leaving the party, Galindo-Garcia drove Romero, her daughter, and a man from the party, nicknamed "Firma," to a taqueria at the corner of 25th Avenue and Foothill Boulevard in Oakland. The group left after "about 10 to 15 minutes" because Galindo-Garcia became nervous when some men arrived. None of the men threatened or confronted Galindo-Garcia or anyone in his group. Galindo-Garcia drove away with Firma sitting in the front passenger seat, Romero sitting behind Firma, and her daughter sitting behind Galindo-Garcia.

Galindo-Garcia drove down Foothill Boulevard, headed to where he and Romero lived on 38th Avenue. When he stopped at a red light at the corner of 35th Avenue, another car driven by Joseph Cox pulled up next to him. At that intersection, the two lanes begin to merge into one. As the light changed, Galindo-Garcia tried to move forward but Cox would not let him in. Romero described Galindo-Garcia stopping to let Cox's car go first, but Cox's car also

stopped, and then both cars attempted to drive forward at the same time. Galindo-Garcia and Cox maneuvered their cars back and forth trying to pass each other. The two drivers continued to vie for the lane all the way down Foothill Boulevard until they stopped at a red light at the corner of 38th Avenue.[2] During the maneuvering down Foothill Boulevard, Cox angrily yelled obscenities in English through his open window. Romero, who testified through an interpreter, could hear Cox yelling, but could not understand all of the words.

At trial, Romero initially did not recall Cox making any gestures. However, she testified at the preliminary hearing and then recalled at trial that Cox stuck his head and hand outside his car and made gestures with his left hand. Cox's driver's side window was down. Romero was afraid of the way Cox was acting and thought that something would happen. Although she did not see Cox with a weapon, she could only see one of his hands and did not know if he had a weapon. She also did not know if Cox was alone in his car.

Romero could tell that Galindo-Garcia was upset because he was being silent with a serious demeanor, and "driving really fast." Neither Galindo-Garcia nor Firma yelled anything back at Cox. Galindo-Garcia told Romero that "he was always being followed and he was tired of it."

At the traffic light at 38th Avenue and Foothill Boulevard, Galindo-Garcia moved into the left-turn lane, while Cox remained in the lane headed straight. Cox continued screaming and yelling. Romero saw the passenger side window of Galindo-Garcia's car open; she saw Galindo-Garcia raise his right arm and then heard the sound of one gunshot. Romero did not know

---

[2] The jury viewed time-stamped surveillance footage of the two cars. The parties stipulated that the surveillance videos accurately depicted Foothill Boulevard on the evening of June 9, 2018 at or around 10:20 p.m.

whether the car's driver had been injured. Prior to the shot being fired, Romero had not seen Galindo-Garcia with a gun that night. But she knew he had a small black pistol that he kept at their house and would carry at times.

Romero recalled that Galindo-Garcia seemed upset and angry after the shot was fired, but "not really scared[.]" He then drove home.

B. Police Investigation

Within 10 minutes of the shooting, Oakland Police Officer Antoine Rushing arrived at "the area of 38th and Foothill" in response to "a call of a vehicle collision." Bystanders directed Officer Rushing to a silver Buick Regal resting against a parked minivan. The Buick's engine was running, the vehicle was still "in drive," and Officer Rushing found an unconscious man, later identified as Cox, in the driver's seat with his hands on the steering wheel. Cox was breathing but unconscious, with what appeared to be a bullet wound in his forehead. A search of the car's interior revealed blood spatter and a cell phone; officers did not find a firearm or firearm paraphernalia in the car or on Cox. A subsequent search of state records by a district attorney inspector revealed no firearms registered to Cox, but the inspector acknowledged that the search would not reveal unregistered firearms, which were "common in Oakland."

Cox was transported to the hospital, where he later died. The cause of death was "a gunshot wound to the head."

## II. *Defense Case*

A. Galindo-Garcia

Galindo-Garcia testified through an interpreter that he was born in 1994 in Mexico; he lived with his grandparents, mother, and four sisters. Galindo-Garcia's grandfather was strict, often came home drunk, and would beat his grandmother. Galindo-Garcia's grandfather died when Galindo-

4

Garcia was eight years old, leaving him as "the only man in the house" to care for his family. He worried about whether his family would have enough food to eat. Galindo-Garcia began working various jobs; he stopped attending school at the age of 14 and began working full time.

Galindo-Garcia immigrated to the United States without documentation when he was 15 years old; the border crossing was a "traumatic" experience given the risks of drowning in the river or being kidnapped by drug cartels. After entering the United States, Galindo-Garcia went to live with an uncle and cousin in the Fruitvale area of Oakland. As an undocumented immigrant with limited English proficiency, Galindo-Garcia felt "discriminated against" and fearful of law enforcement.

In June 2018, Galindo-Garcia was living with Romero and her daughter on 38th Avenue near Foothill. Galindo-Garcia did not consider his neighborhood safe because he had heard gunshots and had "seen fights in that area." In 2015, Galindo-Garcia was robbed at gunpoint in Fruitvale. He did not report the crime because he was afraid he would be sent back to Mexico.

Galindo-Garcia confirmed that on June 9, 2018, he drove Romero and her daughter to a party. Galindo-Garcia acknowledged keeping a .22-caliber gun in his car, asserting that he needed it for "protection" against "[p]eople [who] were following" him. After a couple of hours, Galindo-Garcia drove Romero, her daughter, and his coworker Firma to a taqueria at the corner of 25th Avenue and Foothill. At the taqueria, Galindo-Garcia saw "some people show up [who he] had never seen before," and they started "looking at [him] like they were provoking" him. The unknown people left the taqueria in a car but then returned "five to seven minutes" later and again started "looking at" Galindo-Garcia and his companions.

At that point, Galindo-Garcia "decided to go home" because he considered it "safer" for Romero and her daughter. Accordingly, he started to drive Romero, her daughter, and Firma back to his house on 38th Avenue. As he was driving down Foothill Boulevard, Galindo-Garcia thought he saw the same car with the unknown men from the taqueria following him. This made Galindo-Garcia feel "more nervous" and unsafe.

Galindo-Garcia continued driving down Foothill Boulevard until he reached 35th Avenue, where two lanes on Foothill Boulevard merged into one. As Galindo-Garcia tried to merge into the single lane, another car drove alongside his car and prevented him from merging. The other driver began yelling, sticking his hand out, and giving Galindo-Garcia the finger. Galindo-Garcia could not understand everything the driver was yelling because it was in English. Nevertheless, Galindo-Garcia heard some "swear words" and could tell the driver was yelling insults. He did not yell back and did not know why the other driver was angry.

Galindo-Garcia felt "threatened" because he believed he was being followed by the same car that he had seen at the taqueria. Galindo-Garcia had seen two men at the taqueria and he did not know if the driver was alone. Galindo-Garcia was "scared" that the other driver "would hurt [Galindo-Garcia] and [his] family." Upon viewing the surveillance footage, Galindo-Garcia acknowledged that he could have turned off Foothill Boulevard, but explained that at the time he was "too scared" and "nervous" to think about taking another route home. Galindo-Garcia "just wanted to get home to be safe and to get [his] family to safety."

At the intersection of 38th Avenue and Foothill Boulevard, Galindo-Garcia was not able to turn left immediately because of oncoming traffic, so he ended up right next to the other driver, who was headed straight. He then

6

saw the driver make a "quick movement," turning his torso to his right with both hands out in front of him and moving about 45 degrees to the right. Galindo-Garcia thought the driver was going to pull out a gun from his right side and shoot at him and his family. Galindo-Garcia was "scared" and was not aware of what he was doing. Galindo-Garcia grabbed the gun he had under his seat and shot one time to scare the other driver. He never imagined he could have hit him. He did not shoot to hurt him. He fired the gun without aiming. Galindo-Garcia acknowledged that he never actually saw a gun or object in Cox's hand, but he thought Cox was reaching for a gun.

Galindo-Garcia did not call police because he was scared; he just wanted to get home. He did not learn that a projectile hit or killed anyone until he was arrested in September 2018. Galindo-Garcia admitted that he did not initially tell law enforcement the truth about the incident. At first, Galindo-Garcia told police that they had left the taqueria because Romero was cold and that he turned before 38th Avenue to avoid the traffic. He later told police he had been racing a red car down Foothill Boulevard, but made a left turn before 38th Avenue to avoid any incident since Romero and her daughter were in the car. He did not say he was acting in defense of himself or his family. He explained that he did not trust police, did not think they would believe him, and was worried about being deported. At the end of the interrogation, Galindo-Garcia said he wanted to plead guilty because he had been told Romero had been arrested, and he did not want her to be involved.

About three months after the incident, in September 2018, Galindo-Garcia fired his .22-caliber firearm into the air three times while he was seated in his car in the driveway in front of the house on 38th Avenue. He explained that he and Romero were arguing; she was on the phone with him from inside the house and would not come out. She hung up, and Galindo-

7

Garcia then fired the gun to get her attention. Galindo-Garcia did not think about where the bullets would land and did not think what he did was dangerous. He was never arrested or charged with a crime for firing those shots.

B. Neuropsychology Expert

Laeeq Evered, Ph.D., a clinical psychologist and neuropsychologist, testified as an expert in the field of neuropsychology that studies how human perceptions and reactions are affected by fear, stress, and life-threatening situations; how trauma during development affects those same perceptions and reactions; and adolescent brain development. He did not meet or diagnose Galindo-Garcia; he also did not review any police reports or videos in this case.

Dr. Evered opined that a 23-year-old would not have the same judgment as a person in their mid-30s. It is not until a person reaches around age 25 that they have the most efficient use of the prefrontal cortex, the front part of the brain. The prefrontal cortex is where rational understanding, planning, problem solving, emotional regulation, and inhibiting behavior occur. Until full development, people are much more likely to respond to a given situation without putting things in perspective or considering the consequences of their actions.

Dr. Evered opined that trauma can impact perceptions and functioning. He defined "trauma" as including anything that impairs a person's basic need to survive; it includes not only a physical threat, but also a lack of housing, food, or water.

Dr. Evered explained that in a fear response, an area of the brain known as the amygdala signals the level of the perceived threat to the hypothalamus, which is responsible for regulating the body's heart rate,

8

breathing, blood flow and blood pressure, and signals neurotransmitters and hormones to get the body ready for flight or fight. It heightens the posterior cortex to assist in identifying escape routes or how best to fight. It shuts down the prefrontal cortex, which is responsible for planning, problem solving, self-monitoring, initiating behavior, and inhibiting behavior, and the hippocampus, which is responsible for declarative memory of what has been learned.

Dr. Evered opined that this fear response causes the unconscious part of the brain to make a decision about whether something is dangerous or not, which may or may not be accurate, while the prefrontal cortex, which can make a much more accurate assessment through rational thinking, is inhibited and taking extra time to process. He opined that a fear response of flight or fight is reflexive, involuntary, and not made by rational choice or with a conscious understanding of one's actions. The fear response is triggered when one perceives a threat to oneself or someone close to the individual.

Dr. Evered defined "hypervigilance" as having an excessive focus on a potential threat, which results from an activation of the amygdala. Some situations that have been linked to hypervigilance include: (1) living in a community with a large degree of violence; (2) experiencing situations where the person has a fear he or she will die; (3) witnessing domestic violence within one's home; (4) being robbed at gunpoint; and (5) growing up with frequent concern for family safety or food. The more exposure to these dangers, lack of resources, threats, etc., the more likely one's "survival circuits" will "fire" in the future. Dr. Evered opined that a person exposed to dangerous situations is more likely to have memories that trigger a fear

9

response and that a person with a "trauma informed childhood" is likely to "over-perceive" a threat.

## DISCUSSION

Galindo-Garcia argues that his convictions should be reversed based on numerous asserted errors, including evidentiary issues, instructional error, prosecutorial misconduct, and cumulative error.

### I. Evidence of Galindo-Garcia's Uncharged Post-Offense Gun Use

Galindo-Garcia contends that evidence of the September 2018 shooting incident should not have been admitted, and in an overlapping claim, that the jury should not have been instructed that it could use that incident to show he acted with malice and to refute his claim of self-defense.

### A. *Background*

Defense counsel moved in limine to exclude, and the prosecution moved to admit, evidence of the incident in which Galindo-Garcia shot a firearm into the air near his residence on September 2, 2018, about three months after the charged offenses. Galindo-Garcia was not charged or convicted of a crime in connection with that incident.

The prosecutor sought to admit the evidence to impeach Galindo-Garcia, if he testified, on the ground that it was a negligent discharge crime of moral turpitude. The prosecutor also wanted to admit the post-offense conduct as substantive evidence of Galindo-Garcia's "responsiveness to stressful situations." The prosecutor asserted that Galindo-Garcia's gun use was evidence of his intent; specifically, the prosecutor wanted to use the shooting evidence to "challenge the idea that [Galindo-Garcia's shooting of Cox] was done in self-defense."

Defense counsel objected to admission of the evidence. She argued that, as an incident that postdated the charged offense, it was not relevant; that it

was more akin to character evidence that would permit the jury to speculate Galindo-Garcia acted in conformity with his character to assess his guilt of the charged offenses; and that Evidence Code section 352 required exclusion in light of the substantial danger of confusion and undue prejudice that would be created by admission of the evidence. Defense counsel also argued that the evidence was inadmissible under Evidence Code section 1101, subdivision (b) to prove intent for murder, noting that negligent discharge is not a specific intent crime.

The trial court granted the prosecution's motion and denied the defense motion. It ruled that evidence of the September 2018 gun use was admissible under Evidence Code section 1101, subdivision (b) to prove intent and was not more prejudicial than probative under Evidence Code section 352.

In light of the court's evidentiary ruling, Galindo-Garcia testified about the September 2018 incident. Thereafter, over defense objection, the court instructed the jury with CALCRIM No. 375,[3] which advised the jury that it

---

[3] As given, the instruction read as follows: "There has been evidence presented that the defendant committed the offense of negligent discharge of a firearm in September of 2018 that was not charged in this case. You will be given instruction 970 that describes the elements of this offense. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the negligent discharge of a firearm. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the offense of negligent discharge of a firearm, you may, but are not required to, consider that evidence for the limited purpose of deciding whether: [¶] The defendant acted with malice of aforethought in this case. [¶] And/or [¶] In considering defendant's credibility in accordance with CalCrim 316. [¶] In evaluating this evidence, consider the similarity or lack

11

could consider evidence that Galindo-Garcia "committed the offense of negligent discharge of a firearm" in September 2018 in deciding whether he acted with malice aforethought in this case and/or in evaluating his credibility.

## B.    *Applicable Law*

"Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent." (*People v. Kipp* (1998) 18 Cal.4th 349, 369.) Evidence Code section 1101, subdivision (b), provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act."

The Supreme Court has identified three factors essential to the admissibility of such uncharged conduct: "(1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any *rule* or *policy*

---

of similarity between the uncharged offense and the charged offenses. [¶] Do not consider this evidence for any other purpose except for the limited purpose of whether defendant acted with malice aforethought on the night of the shooting and/or in considering defendant's credibility in accordance with CalCrim 316. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶] If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder and shooting at an occupied motor vehicle. The People must still prove each crime and allegation beyond a reasonable doubt."

requiring the exclusion of relevant evidence." (*People v. Thompson* (1980) 27 Cal.3d 303, 315 (*Thompson*), superseded on other grounds as stated in *Clark v. Brown* (9th Cir. 2006) 442 F.3d 708, 714, fn. 2.)

The first factor—materiality—is not at issue in this case, as the fact sought to be disproved by the prosecution relates to Galindo-Garcia's mental state: whether he had an objectively reasonable belief in the need for self-defense. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082; *People v. Wells* (1949) 33 Cal.2d 330, 345 [self-defense is "limited to such acts as are either *actually* reasonably necessary or which would appear to a *reasonable* person, under the same circumstances, to be reasonably necessary"].) The parties dispute the second and third factors under *Thompson*—relevance and exclusion.

Under the second factor, an uncharged act may be relevant circumstantial evidence of motive or specific intent, undermining a self-defense claim. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 14 [uncharged act was circumstantial evidence of motive and specific intent to rob, negating self-defense claim]; *People v. Simon* (1986) 184 Cal.App.3d 125, 130–131 [jealousy motive, if shown by uncharged act, may be admissible to establish same motive and undermine self-defense claim].) A trial court must "examine the precise elements of similarity between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter is reasonably strong." (*People v. Schader* (1969) 71 Cal.2d 761, 775.) "If the connection between the uncharged offense and the ultimate fact in the dispute is not clear, the evidence should be excluded." (*Thompson, supra*, 27 Cal.3d at p. 316.)

13

The third *Thompson* factor recognizes extrinsic policies limiting admissibility of uncharged acts. Because " 'substantial prejudicial effect [is] inherent in [such] evidence,' " uncharged acts are admissible under Evidence Code section 352 only if they have substantial probative value. (*Thompson, supra*, 27 Cal.3d at p. 318, fn. omitted; see *People v. Ewoldt* (1994) 7 Cal.4th 380, 404 ["Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis' "]; *People v. Lewis* (2001) 25 Cal.4th 610, 637 [" '[T]he probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury' "].) The probative value of evidence depends on the degree of relevancy (the extent to which the evidence tends to prove an issue by logic and reasonable inference), materiality (the importance of the issue to the case), and necessity (the need to prove the issue by means of the uncharged act). (*Thompson, supra,* at p. 318, fn. 20.)

A trial court's rulings under Evidence Code sections 1101 and 352 are reviewed for abuse of discretion (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 239), with attention paid to " 'the legal principles and policies that should have guided the court's actions.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

C.     *Analysis*

Galindo-Garcia argues that his post-offense conduct was irrelevant and prejudicial. We disagree.

1.     Relevance

Focusing on our high court's statement that the uncharged conduct must be sufficiently similar to the charged offense "to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance" ' "

14

(*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 402), Galindo-Garcia argues that the uncharged gun use was irrelevant to prove his intent because negligent discharge is a general intent crime, whereas murder requires specific intent, and therefore together they would not show that he had "the same intent" both times. Relatedly, he argues that the two offenses are insufficiently similar in any event, because when he fired the gun outside Romero's house he was not angry or fearful, but simply wanted to get her attention. Finally, he argues that the uncharged incident is not relevant because it occurred three months *after* the charged offense.

Garlindo-Garcia's first argument is contrary to *People v. Molano* (2019) 7 Cal.5th 620 (*Molano*), where a defendant charged with committing murder by strangulation during a rape challenged the trial court's admission of evidence that he had previously strangled his wife to unconsciousness. (*Id.* at p. 665.) The defendant claimed that the victim's death was an accident during a consensual sexual encounter, and the prosecution sought to introduce the prior incident as evidence of the defendant's intent. The defendant argued error based in part on the fact that corporal injury on a spouse, unlike murder, is a general intent crime, but the court rejected the argument, concluding that his conduct with his wife could support an inference "that he acted with conscious disregard for the danger to the lives of both women, and that he intended to dominate his intimate partners in that manner." (*Ibid.*)

Likewise, here we find sufficient similarity between the two incidents insofar as both could illustrate Galindo-Garcia's willingness to recklessly fire a gun in conscious disregard for the possible danger to human life. "[T]he 'least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent.' " (*Molano*, *supra*, 7 Cal.5th at

15

p. 665.) Galindo-Garcia's willingness to fire a gun when he had no fear for his life but simply wanted to get Romero's attention after she hung up on him during an argument was relevant to whether Galindo-Garcia acted with conscious disregard for the danger it posed when he fired his gun through the open passenger-side window and into Cox's car after Cox had been driving aggressively and shouting obscenities. Moreover Galindo-Garcia does not explain why, for this purpose, it should make a difference that the incident with Romero was the second to occur. In our view, that fact does not undermine its probative value, especially considering that the two incidents were separated by only three months.

2.     Undue Prejudice

Under Evidence Code section 352, the court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice."

On this record, we discern no abuse of trial court discretion in admitting evidence of the uncharged shooting incident. As discussed, the main issue in dispute was Galindo-Garcia's intent, making the probative value of the uncharged incident very high. The uncharged shooting was not inflammatory in comparison to the shooting death of Cox. Finally, although the jury was aware that Galindo-Garcia was never arrested or charged in the subsequent offense, the trial court gave a limiting instruction that minimized the danger that the jury would consider the evidence for an improper purpose. Using CALCRIM No. 375, the jury was cautioned appropriately that it must not conclude from the September 2018 evidence "defendant has a bad character or is disposed to commit a crime"; the evidence "is not sufficient by

16

itself to prove that the defendant is guilty"; and the prosecution "must still prove each crime and allegation beyond a reasonable doubt."

For the foregoing reasons, we conclude that Galindo-Garcia has not established that the court exercised its discretion to admit the challenged evidence " ' "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Jackson* (2016) 1 Cal.5th 269, 330.)

## II. Evidence that the Victim Did Not Own a Registered Firearm

Over defense objection, the trial court allowed the prosecution to introduce evidence that the state's database reflected Cox did not have a registered firearm. Galindo-Garcia contends that the trial court abused its discretion in admitting this irrelevant evidence. We agree, but conclude the error was harmless.

Although a court has broad discretion to admit evidence, it has no discretion to admit irrelevant evidence. (Evid. Code § 350; *People v. Babbitt* (1988) 45 Cal.3d 660, 681.) Relevant evidence is that which tends to prove or disprove a disputed, material fact. (Evid. Code § 210; *People v. Boyette* (2002) 29 Cal.4th 381, 428.) Here, there was no dispute that Galindo-Garcia shot and killed Cox. Numerous witnesses testified that the police did not find a gun in Cox's car. Indeed, Galindo-Garcia did not testify that he saw Cox with a gun. Rather, Galindo-Garcia testified that he *thought* Cox was *reaching* for a gun. The sole issue at trial was Galindo-Garcia's mental state at the time he killed Cox.

Whether Cox was a registered gun owner had no tendency to prove or disprove Galindo-Garcia's mental state at the time of the killing, i.e. whether he unlawfully intended to kill Cox (express malice) or he intentionally acted with conscious disregard for life (implied malice). (§§ 187, 188; *People v.*

17

*Blakely* (2000) 23 Cal.4th 82; CALCRIM No. 520). Similarly, the fact that Cox did not own a registered gun had no bearing on whether Galindo-Garcia had a reasonable belief in the need to defend himself or his family from imminent danger of death or great bodily injury (perfect self-defense), or if he had an honest but unreasonable belief in the need to defend himself or others from imminent danger (imperfect self-defense). (See *People v. Randle* (2005) 35 Cal.4th 987, 994; overruled on a different point by *People v. Chun* (2009) 45 Cal.4th 1172, 1201.)

Nevertheless, we conclude that the error in admitting this irrelevant evidence was harmless. The firearm registration evidence constituted a minor part of the prosecution's case, and the jury heard ample evidence establishing that Cox did not have a firearm in the car during the incident in question. (See *People v. Elliot* (2005) 37 Cal.4th 453, 473.) We conclude that it is not reasonably probable that a result more favorable to Galindo-Garcia would have been reached in the absence of this error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

## III. Consciousness of Guilt and Flight Instructions

Galindo-Garcia contends that his due process rights were violated when the trial court instructed the jury with CALCRIM No. 362 (consciousness of guilt) and CALCRIM No. 372 (flight) because the instructions were not supported by the evidence, created permissive inferences that lessened the prosecution's burden of proof, and discriminated against undocumented persons of color.

### A.     *Background*

Over Galindo-Garcia's objection, the trial court instructed the jury with CALCRIM No. 362, which states: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing

the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." Also over Galindo-Garcia's objection, the jury was instructed with CALCRIM No. 372, which provides: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Defense counsel discussed the challenged instructions in closing argument: "So what are the reasonable explanations that Eduardo perhaps didn't stay on the scene, and what are the reasonable reasons, interpretations, why he could have been not forthcoming with the police? [¶] Eduardo told you that he's undocumented. He told you that he did not trust police. He fears deportation. He fears immigration detention. And he also told you that he was aware of ICE raids occurring within the City of Oakland around the time this incident happened and around the time that he was arrested. [¶] You also have to keep in mind that this was one and a half years into the Trump[] presidency, a presidency that was earmarked by overt hostility towards immigrants, particularly Latin American immigrants. [¶] He told you that he also feared not being believed by the police and he worried about communication issues due to language barrier. [¶] Yesterday the prosecution argued because the police were nice and spoke Spanish, that should have overcome all of Eduardo's fears about over[-]policing, ICE raids in his community, discrimination that he's experienced, and the viteral [*sic*]

19

that he was being exposed to by the country's leader at the time. [¶] I don't think that that's reasonable. That's not how it works. When you've experienced these things as being here in the U.S. for the last eight years, over 23 years you've been exposed to all that you've been exposed to, the law enforcement system in Mexico, seeing your neighbors being deported and detained, I don't think that it's reasonable just to expect, you know, because these officers are nice and speak Spanish, I can trust them. That's naive to suggest that's how the world works. [¶] So certainly all of those reasons are a reasonable explanation for why Eduardo didn't tell the police everything that happened while he was interrogated. And certainly that's a reasonable explanation for continuing home that night if in fact you do consider that's flight."

## B. Analysis

Galindo-Garcia does not contend that CALCRIM No. 362 and CALCRIM No. 372 are unconstitutional as written. Rather, he makes an as applied challenge to the instructions, arguing that they discriminate against him as an undocumented person of color because they fail to acknowledge that people of color, particularly non-English speaking immigrants, flee from police and are not forthcoming with information due to racially disparate policing practices and governmental policies disfavoring immigrants. An as applied challenge "contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the [law] has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.) "[T]he court evaluates the propriety of the application on a case-by-case basis . . . ." (*Ibid.*)

20

Galindo-Garcia contends that the flight (CALCRIM No. 372) and consciousness of guilt instructions (CALCRIM No. 362) deprived him of his due process right to a fair trial. "In order to declare a denial of [due process] we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." (*Lisenba v. California* (1941) 314 U.S. 219, 236.)

CALCRIM Nos. 372[4] and 362 describe permissive inferences, which allow—but do not require—the trier of fact "to infer the elemental fact[s] from proof by the prosecutor of the basic one[s] and which place[] no burden of any kind on the defendant." (*Ulster County Court v. Allen* (1979) 442 U.S. 140, 157 (*Allen*).) The first sentence of each instruction describes the inference: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt." (CALCRIM No. 372); "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt." (CALCRIM No. 362.) Galindo-Garcia argues that "the trial court should not have instructed the jury with

---

[4] CALCRIM No. 372 implements section 1127c, which provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given." (See *People v. Carrasco* (2014) 59 Cal.4th 924, 967 [flight instruction is statutorily required when prosecution relies on evidence of flight " 'as tending to show guilt' "].)

CALCRIM nos. 372 or 362 because the record did not support a reasonable inference that Galindo-Garcia's failure to stay at the intersection or tell police what actually occurred at the outset was based on consciousness of guilt."

"A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." (*Francis v. Franklin* (1985) 471 U.S. 307, 314–315; see *Allen, supra*, 442 U.S. at p. 157 [because a "permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference"].) Courts have consistently upheld CALCRIM No. 372 and CALCRIM No. 362 against other constitutional challenges. (See, e.g., *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, 1159 [instruction does not lower prosecution's burden of proof]; *People v. Paysinger* (2009) 174 Cal.App.4th 26, 30–32 [instruction does not unconstitutionally presume a crime was committed]; *People v. Howard* (2008) 42 Cal.4th 1000, 1025 ["We have repeatedly rejected arguments attacking [CALCRIM No. 362]"]; *People v. Nakahara* (2003) 30 Cal.4th 705, 713 [rejecting challenges to CALCRIM No. 362's predecessor, CALJIC No. 2.03].) Our Supreme Court has also held that CALCRIM No. 362 does not permit the jury to draw irrational inferences of guilt where, as here, there is a basis for the jury to make an inference that a defendant made a self-serving statement to protect himself. (See *Howard,* at p. 1025; see also *People v. Alexander* (2010) 49 Cal.4th 846, 922 [noting consistent rejection of arguments that consciousness of guilt instructions are improper].)

22

We disagree with Galindo-Garcia that the evidence in this case did not support instructing the jury with CALCRIM No. 372 and CALCRIM No. 362. It is undisputed that Galindo-Garcia drove away after shooting Cox[5] and that he was not truthful when he first spoke to police. That Galindo-Garcia had reasons for driving away and being less than forthcoming with police speaks not to the sufficiency of the evidence supporting the instructions, but to contradictions in the evidence, the resolution of which were within the sole province of the jury. (See *People v. Richardson* (2008) 43 Cal.4th 959, 1020; see also *People v. Carrasco* (2014) 59 Cal.4th 924, 967 [evidence of mere fact of defendant's flight was " 'sufficient evidence to warrant instructing the jury to determine whether flight occurred and, if so, what weight to accord such flight' "].) " 'Moreover, the instruction given adequately conveyed the concept that if flight was found, the jury was permitted to consider alternative explanations for that flight other than [Galindo-Garcia's] consciousness of guilt.' " (*Ibid.*; see also *People v. Carter* (2005) 36 Cal.4th 1114, 1182 ["the instruction merely permitted the jury to consider evidence of flight in deciding defendant's guilt or innocence; it did not suggest that the jury should consider such evidence as dispositive"]; accord, *People v. Abilez* (2007) 41 Cal.4th 472, 522.)

Galindo-Garcia argues that the instructions violate due process because they have a disparate and discriminatory impact on persons of color—particularly non-English speaking immigrants fearful of deportation—who might have objectively reasonable and lawful reasons for avoiding the police and for not being entirely forthcoming with information. Galindo-Garcia cites studies related to institutional racism, including a Judicial Council of

---

[5] CALCRIM No. 372 does not mention flight from police but immediate flight from a crime.

California report about African American and Latin American individuals making up greater percentages of the criminal defendant population relative to their percentage of the total California population.

We by no means ignore that " 'as a practical matter neither society nor our enforcement of the laws is yet color-blind,' " and the resulting "uneven policing may reasonably affect the reaction of certain individuals—including those who are innocent—to law enforcement." (*United States v. Brown* (9th Cir. 2019) 925 F.3d. 1150, 1156.) However, the existence of other reasons for flight and untruthful statements does not compel the conclusion that a consciousness of guilt inference would be unreasonable as a matter of law. Those arguments are (and, in this case, were) properly directed to the jury, which must decide what weight, if any, to give the evidence of Galindo-Garcia's flight and initial false statements.

Pointing to cases discussing whether and to what extent flight can be considered in determining whether a peace officer has reasonable suspicion to detain a suspect (see, e.g., *United States v. Brown, supra,* 925 F.3d at pp. 1156–1157), Galindo-Garcia posits: "If the flight of a person of color from police does not create reasonable suspicion to detain, it is incongruous to allow jurors to use flight or his initial failure to disclose to law enforcement to find that Galindo-Garcia was conscious of guilt." But none of Galindo-Garcia's authorities found flight categorically irrelevant as he would have us do here; rather, they acknowledge that racial disparities in policing are relevant to determining whether flight supports a reasonable suspicion to detain. (See *Brown*, at p. 1157 ["Given that racial dynamics in our society—along with a simple desire not to interact with police—offer an 'innocent' explanation of flight, when every other fact posited by the government weighs so weakly in support of reasonable suspicion, we are particularly hesitant to allow flight to

24

carry the day in authorizing a stop"].) The *Brown* court emphasized that data about racial disparities in policing "cannot replace the 'commonsense judgments and inferences about human behavior' underlying reasonable suspicion analysis," but "can inform the inferences to be drawn from an individual who decides to step away, run, or flee from police without a clear reason to do otherwise." (*Ibid.*)

Accordingly, we conclude the trial court did not err in instructing the jury with CALCRIM Nos. 372 and 362.

## IV. Prosecutorial Misconduct

Galindo-Garcia next asserts that the prosecutor committed two instances of misconduct during closing and rebuttal argument that violated his constitutional rights to due process and a fair trial, which require reversal of the judgment.

### A.    *Applicable Law*

"We review claims of prosecutorial misconduct pursuant to a settled standard. 'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " ' " (*People v. Dykes* (2009) 46 Cal.4th 731, 760.)

25

*B.    Misrepresentation of Law*

Galindo-Garcia argues that the prosecutor committed misconduct during argument to the jury by misstating the law of self-defense.

1.    Background

Prior to the arguments of counsel, the trial court instructed the jury that it "[m]ust follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.) The court instructed the jury on the concept of lawful self-defense where "[t]he defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury[.]" (CALCRIM No. 505.) The jury was further instructed on imperfect self-defense based on the defendant's "unreasonable" belief that "he or someone else was in imminent danger of being killed or suffering great bodily injury[.]" (CALCRIM No. 571.)

In his argument, the prosecutor told the jury that Galindo-Garcia's testimony that he believed Cox was reaching for a gun was inconsistent with self-defense because "a preemptive strike is not an honest belief in the need for self-defense." The prosecutor added, "So if I prove to you that he didn't actually believe that he was in imminent danger of being killed, . . . self-defense fails no matter what you decide about everything else." The prosecutor further argued:  "If I prove to you there was *no imminence*, self-defense fails." (Italics added.) Defense counsel objected immediately, arguing that the "instruction specifically says that the danger doesn't need to actually exist"; the trial court sustained the objection and told the jury not to consider "that portion" of the prosecutor's argument.

The prosecutor also emphasized the word "fear" as providing "context of the state of mind that is required for a defendant to act in self-defense."

26

Defense counsel again objected that the prosecutor was misstating the law. In response, the court told the jury: "Same admonition, ladies and gentlemen. To the extent that the lawyers' arguments differ from the law as I give it to you, you must be guided by the instruction that I give you." Later, the prosecutor argued that Galindo-Garcia had not fired a shot out of fear, but rather because he was upset and angry.

### 2. Overview of Self-Defense

We briefly review the principles of self-defense. The doctrines of perfect and imperfect self-defense are related but lead to different results. (See *People v. Randle*, *supra*, 35 Cal.4th 987, 994.) Perfect self-defense requires that the defendant has an actual and reasonable belief in the need to defend "from imminent danger of death or great bodily injury." (*Ibid.*) "A killing committed in perfect self-defense is neither murder nor manslaughter; it is justifiable homicide." (*Ibid.*) Alternatively, a defendant may have acted in imperfect self-defense if he or she had an honest but unreasonable belief in the need to defend from imminent danger. (*Ibid.*) Imperfect self-defense negates the malice required for murder and mitigates a homicide to the lesser included offense of voluntary manslaughter. (*Id.* at pp. 994–995; see § 187, subd. (a) ["Murder is the unlawful killing of a human being . . . with malice aforethought"]; § 192 ["Manslaughter is the unlawful killing of a human being without malice"].)

For both perfect and imperfect self-defense, fear of future harm is insufficient. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.) Bare fear is not enough; " 'the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.' " (*People v. Trevino* (1988) 200 Cal.App.3d 874, 878–879.) Nevertheless, the law does not require "an absence of any feeling other than

27

fear," only that "the party killing *act* out of fear alone." (*Id.* at p. 879.) If anger or other emotions are "causal factors in his decision to use deadly force," "the homicide cannot be justified on a theory of self-defense." (*Ibid.*) "[T]his rule does not 'imply that a person who feels anger or even hatred toward the person killed, may never justifiably use deadly force in self-defense,' " only that the party killing act out of fear alone. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1045.) It is "for the jury to decide whether [the] defendant acted out of fear alone when he shot and killed [the victim]." (*Ibid.*)

3. Analysis

The prosecutor erred to extent he suggested that Galindo-Garcia's *entire* self-defense claim failed in the absence of imminence. First, self-defense does not require the existence of actual imminence. Rather, the focus is on whether the defendant reasonably believed he was in imminent danger. (See *People v. Randle, supra,* 35 Cal.4th at pp. 994–995.) Second, even if Galindo-Garcia unreasonably believed he was in imminent danger, a claim of imperfect self-defense could have been established. (See *id.* at p. 994.) Further, to the extent the prosecutor suggested that Galindo-Garcia's anger was incompatible with a self-defense claim, this too was error. (See *People v. Nguyen, supra,* 61 Cal.4th at p. 1045.)

Nevertheless, we conclude that the prosecutor's misstatement of the law was "harmless in light of the correct instructions on the subject of [self-defense] that were given to the jury." (*People v. Medina* (1995) 11 Cal.4th 694, 760 [discussing prosecutorial misstatement on elements of second degree murder]; see also *People v. Forrest* (2017) 7 Cal.App.5th 1074, 1083 ["Even if the remarks concerning voluntary intoxication amounted to a misstatement of the law, the error was harmless" because the "trial court fully and correctly instructed the jury on the significance of voluntary intoxication"]; *People v.*

28

*Williams* (2009) 170 Cal.App.4th 587, 635 ["Here, even if the prosecutor's argument was a misstatement of the law, the trial court properly instructed the jury on the prosecutor's burden of proving every element of the charges beyond a reasonable doubt"].) "The jury was told that it should apply the law stated in the instructions, and that if anything said by the attorneys conflicted with those instructions, the latter would control." (*Medina*, at p. 760; see also *Forrest*, at p. 1083 ["The court also instructed that the jury must abide by the court's instructions if any of the attorneys' comments conflicted with the jury instructions given"]; *Williams*, at p. 635 ["the trial court instructed the jury[,] . . . 'If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions' "].) "In the absence of any evidence of confusion on the part of the jury, '[j]urors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.' " (*Forrest*, at p. 1083, quoting *People v. Sanchez* (2001) 26 Cal.4th 834, 852; accord, *Williams*, at p. 635.)

## C.     *Improper Comment on Lack of Defense Evidence of Self-Defense*

Galindo-Garcia argues that the prosecutor committed misconduct during rebuttal argument by criticizing the defense for not presenting evidence that the court had excluded during pre-trial motions.

### 1.     Background

The prosecutor moved in limine to admit Galindo-Garcia's confession to Romero a week after the murder that he shot Cox because he was "upset by what [Cox] had been saying to him." The prosecutor simultaneously moved, however, to exclude Galindo-Garcia's subsequent statement to Romero "that instead of allowing something to happen to him and his daughter, instead of his family crying, he would rather the victim's family cry." The prosecutor

29

argued that the first statement was admissible as a party admission, but that the second statement was not admissible under the rule of completeness in Evidence Code section 356 and that Galindo-Garcia could not offer his own hearsay statement into evidence.

At the hearing on the motions in limine, defense counsel argued that if the prosecutor offered the first statement, then under Evidence Code section 356 the entire statement could be admitted. The trial court ultimately agreed, and as a result the prosecution did not elicit Galindo-Garcia's statement to Romero about being the shooter.

During his rebuttal argument, however, the prosecutor argued: "Counsel . . . talked about Delmy Romero, and she was interviewed six times. And if anything Delmy had said ever supported self-defense, you could be sure that she would have been impeached with that." Defense counsel immediately objected and requested a side bar. The trial court took the matter under submission and the prosecutor continued: "The only thing that Delmy Romero said in her testimony that indicates the defendant believed his life was in imminent danger was his nervousness leaving the taco stand." Defense counsel objected again; the trial court reiterated that the matter was under submission and allowed the prosecutor to continue.

During a recess, defense counsel elaborated that Romero *did* say something that supported Galindo-Garcia's claim of self-defense. Specifically, Galindo-Garcia told Romero "that instead of allowing something to happen to him and his daughter, instead of his family crying, he would rather the victim's family cry." Defense counsel asserted that she would have asked Romero about that statement but did not because—as the trial court had recognized in limine—the statement was inadmissible hearsay.

30

The trial court agreed that the prosecutor's argument was "improper" because it implied the nonexistence of a statement when "an in limine ruling . . . did not allow that very evidence to come in." Accordingly, when the recess ended, the court admonished the jury that the prosecutor's argument about what Romero had not said "was error . . . because not everything that . . . Romero told interviewers was legally admissible as evidence in this trial." As such, the jury was instructed "not to consider" the argument in question "for any purpose during [its] deliberations because [the argument] was error."

2.     Analysis

The Attorney General concedes that the prosecutor erred by criticizing the defense for failing to present evidence the court had excluded, but argues that the court's admonition cured the error and even if it did not, the error was harmless. We agree.

The prosecutor's remark was an isolated statement to which counsel immediately objected and the trial court ultimately disapproved. Although the trial court's admonition to the jury to disregard the prosecutor's statement did not clarify that the prosecution—not the defense—had the burden of proving beyond a reasonable doubt that Galindo-Garcia did not act in lawful self-defense, other instructions properly instructed the jury on the burden of proof. (See CALCRIM Nos. 220 [reasonable doubt]; 505 [justifiable homicide]; 571 [imperfect self-defense].)

**V. Cumulative Prejudice**

Galindo-Garcia argues that the cumulative effect of the errors he asserts, even if in isolation none warrants reversal, is enough to justify a reversal of his murder conviction.

" 'The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would

31

independently warrant reversal.' " (*Ybarra v. McDaniel* (9th Cir. 2011) 656 F.3d 984, 1001.)

For the issues on which we have undertaken a prejudice analysis, these claimed errors were independent of one another. The cumulative effect of independently harmless errors remains harmless. "Defendant was entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) Fundamentally, Galindo-Garcia received a fair trial.

## VI. Resentencing Is Required

Galindo-Garcia raises three sentencing claims: (1) the trial court erroneously imposed the firearm enhancement (§ 12022.5, subd. (a)) regarding his shooting at an occupied vehicle conviction (§ 246 [count 2]); (2) remand is required in light of retroactive changes to section 1170; and (3) remand is required in light of retroactive changes to section 654.

### A. *Firearm Enhancement*

The Attorney General agrees the firearm enhancement must be stricken. We accept the Attorney General's concession. When—as here— firearm use is an element of the offense, the section 12022.5 enhancement "does not apply." (*People v. Kramer* (2002) 29 Cal.4th 720, 723, fn. 2.) Thus, the section 12022.5 enhancement attached to count 2 must be stricken. (*People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1094, fn. 3.)

### B. *Section 1170 Amendments*

The Attorney General also concedes that the matter should be remanded for resentencing under Senate Bill No. 567 and Assembly Bill No. 124. Effective January 1, 2022, those pieces of legislation amended section 1170 in two relevant respects. (See Sen. Bill No. 567 (2021–2022 Reg. Sess.); Stats. 2021, ch. 731, § 1.3; Assem. Bill No. 124 (2021–2022 Reg. Sess.); Stats. 2021, ch. 695, § 5.)

32

Under amended section 1170, subdivision (b), a court must "order imposition of a sentence not to exceed the middle term," except under narrow circumstances. (§ 1170, subd. (b)(1).) An upper term may be imposed "only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) We agree with the parties that this amendment applies retroactively in this case. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1035, 1038–1039 (*Flores*) [ameliorative changes to section 1170 apply retroactively].)

Amended section 1170, subdivision (b)(6) provides that "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if" the defendant "has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence." (§ 1170, subd. (b)(6)(A).) We agree with the parties that this amendment applies retroactively to Galindo-Garcia's case (see *Flores, supra,* 73 Cal.App.5th at pp. 1038–1039) and that the matter must be remanded so that Galindo-Garcia can present evidence of trauma he suffered at a resentencing hearing.

C.    *Amendment to Section 654*

Finally, the Attorney General agrees that the ameliorative change to section 654, which no longer requires trial courts to impose the longest prison term (See Assem. Bill No. 518 (2021–2022 Reg. Sess.); Stats. 2021, ch. 441, § 1), applies retroactively. However, the Attorney General argues that

33

Garcia-Galindo's claim based on this amended legislation is moot because we are already remanding for resentencing in light of the changes to section 1170. We agree that we need not address this issue because the sentencing court will consider all sentencing provisions applicable at the time of resentencing, including section 654 as amended by Assembly Bill No. 518.

## DISPOSITION

The section 12022, subdivision (a) enhancement attached to count 2 is stricken. Galindo-Garcia's sentence is vacated, and the matter is remanded to the trial court for full resentencing in accordance with current sentencing laws. After the trial court has resentenced Galindo-Garcia, the clerk of the superior court is directed to prepare an amended abstract of judgment and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
STREETER, J.

34